UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA,

    -against-

TAMEKA LEWIS

            Defendant.

-------------------------------------------------------X

           21 Cr. 349 (JSR)

           AFFIDAVIT

TAMEKA LEWIS, being duly sworn deposes and says:

1. I am the defendant in the above captioned case.  I submit this affidavit in support of the accompanying motion to suppress a statement I made to Department of Investigations ("DOI") investigators, alleged contraband that was recovered from my purse, and evidence that was recovered from my cellular phone.

2. I have been employed by the Department of Corrections since approximately October of 2017.  I have never been involved in a work-related investigation before.  At approximately 8:00am on September 18, 2020, I arrived at my place of employment, which is the Otis Bantum Correctional Center ("OBCC") located on Rikers Island at 16-00 Hazen Street, East Elmhurst, NY, 11370.  After I parked my vehicle in the employee parking lot located directly outside of the facility, I locked my cellular phone inside of a locker.  This is an institutional requirement, as I am not allowed to bring my personal phone into OBCC.

3. After I secured my phone, I walked into the facility, placed my clear pink purse on the scantron, and walked through the metal detector.  After I cleared the metal detector, I

1

walked for approximately five or six feet, when one male and one female, who I later learned were DOI investigators, blocked my ability to keep walking.

4. The male was in front of me, and the female was behind me. The male investigator said, "come with me." I did not think that I could tell him "No." Two more investigators appeared and stood behind me. I felt like I was being held captive, therefore, I followed the four investigators into a small office that had no windows and contained a desk and no chairs.

5. Once I entered the office, one male investigator said, "give me your bag." Again, I felt like these investigators had control over me and I did not think I had a choice, so I turned over my purse. The female investigator then told me to turn around so that she could pat me down. Once she completed her pat down of me, she directed me to stand to the side while the investigators rifled through my purse.

6. After a few minutes, the investigators removed two folders and a photo sized envelope from my purse. There was no odor emanating from the folders and envelope and the papers they contained were not visible unless the folders and envelope were opened.

7. One of the investigators asked me, "where did you get the paper from." I was then instructed to follow them out of the office. I was escorted out of OBCC and into the employee parking lot by these four investigators. Once there, I was instructed to retrieve my cellular phone from my locker. I did not think I had a choice, so I took my phone out of my locker and the investigators told me to hand it over. Again, I did not think I was able to tell them "No." I turned over my phone to one of the investigators and I was placed in the back of a van. One investigator was sitting next to me, and two investigators were sitting in the front.

8. We drove for approximately two minutes, until we came to the investigations trailer. Once we arrived, I was told to exit the vehicle and to enter the trailer. The trailer was the size of a small mobile home and contained a small bathroom, two or three desks, and a room with two or three windows and a long table. When we arrived at this trailer, it was approximately 8:45am.

9. I was escorted to this room and instructed to sit down at the table with Inspector Walker, whom I recognized, and one other inspector. Almost immediately, Inspector Walker started to tell me to "relax," and that everything was going to be okay. He also told me that I could drink the coffee I had in my purse. He was not recording this portion of our conversation.

10. Shortly after this conversation, two other investigators joined us, including the supervisor of the investigation's unit. Inspector Walker asked me questions about my job title and the tasks and standards related to that title. The supervisor then cut in and informed me that this was a voluntary process, and that if I answered their questions, I would be able to return to work. I was then required to sign a voluntary interview form. Although I signed the form, I believed that if I did not speak to them, I would be arrested, putting my employment with the Department of Corrections in jeopardy. I was not given Miranda warnings.

11. I was told that the interrogation would be recorded. At this time, they talked amongst themselves about how to record the interrogation. They decided that Inspector Walker would record it on his cellular phone. I asked why and was told that it was for my benefit. The recording device was turned on after I had already been questioned for approximately fifteen minutes.

12. Being questioned by four investigators, including a supervisor, made me very scared and nervous. At one point during this interrogation, I was shaking.

13. The investigators kept trying to reassure me that this was just going to be a conversation to hear my side of the story. Approximately fifteen minutes after the recording device was turned on, I was offered a cigarette and a break. I was told that I could relax and smoke and that no one would ask me any questions while I was smoking. The recording device was then turned off.

14. One of the female investigator's followed me outside and continued to question me. One of the questions that I recall is whether I had any regrets at my job. She then began speaking about an employee who recently committed suicide, but after a few minutes she transitioned back to interrogating me and asked me where I got the papers from. I told her, and she told me that no one would believe me. After approximately five to ten minutes, I was escorted back into the trailer. The recording device was turned back on, and the interrogation continued.

15. During this questioning, investigators kept trying to make me comfortable and kept telling me that they just wanted to have a conversation with me. They continued asking me questions about the paper recovered from my purse. They also began asking me about specific inmates that I had contact with, and their family members. They also showed me photographs of inmates and asked me to identify them and asked whether I ever brought anything into OBCC for these inmates.

16. After approximately one hour of further questioning, I explained that I no longer wanted to speak with them. I also told them that I had to use the bathroom. The recording device was turned off and I was escorted to the bathroom by one of the female

investigators. She checked the bathroom before I used it and told me not to flush the
toilet when I was finished. After I finished using the bathroom, she checked the
bathroom again and flushed the toilet for me.

17. I was then escorted back to the interrogation room, and investigators began questioning
me again. They did not however turn the recording device back on. During this portion
of the interrogation, the investigators continued to ask me questions about the papers
recovered from my purse. They also asked if they could search through my phone.

18. I told the investigators that I did not want them to look through my phone, but they
continued to try to make me relax and to ask to search my phone. After approximately
thirty to forty minutes, they said, "Do you want to smoke and calm down and come back
to talk to us." I was again offered a cigarette and escorted outside of the trailer with the
female investigator. Shortly after we arrived outside, a second investigator joined us, and
he began asking me if I gambled and played roulette. When I told him that I did, he
asked me what my favorite numbers were. Once I told him, he returned to the trailer. I
believe that the investigator was trying to figure out my phone password, although my
favorite numbers was not the password.

19. After approximately five to ten minutes of smoking, I was escorted back into the trailer
again. Once seated, the investigators again asked for my cellular phone. They spent
what seemed like a very long time trying to get me to give them the password to my
cellular phone. Eventually, I again informed them that I no longer wanted to speak to
them, and just wanted to get back to work.

20. The investigators then called someone on the phone for me to speak to. I do not know
who this person was, but I was told that although I could refuse to allow investigators to

5

go through my phone, they were going to confiscate my it anyway. I did not think I had a choice in the matter, and therefore asked if I could retrieve some phone numbers before it was confiscated. The person on the phone told me I could.

21. The investigations supervisor stood directly over me as I opened my phone and began copying down phone numbers. After a few minutes, she told me that I had taken down enough numbers and ordered me to turn the wi-fi off and to turn my phone off. She then took my phone from me.

22. At approximately 1:45pm, another group of two or three investigators, who I believe were from a different department, arrived in the trailer and asked me to sign a paper to allow them to search my phone. I did not sign the paper for my phone but was given a receipt for my phone and for my employee identification, which was also confiscated. I was then told that I was going to be suspended without pay. Two investigators drove me to my car and followed me until I was off of Rikers Island.

WHEREFORE, I pray the Court grants the within motion to suppress.

Tameka Lewis

Sworn to me this 22 day of July 2021

Christine Delince, Esq.
Notary Public, State of New York
Queens County
My Commission Expires On
October 17, 2024