```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------x
UNITED STATES OF AMERICA,            :
                                     :
                                     :   21-cr-349 (JSR)
        -v-                          :
                                     :   MEMORANDUM ORDER
                                     :
TAMEKA LEWIS,                        :
                                     :
              Defendant.             :
-------------------------------------x
```

JED S. RAKOFF, U.S.D.J.

The Government alleges in a four-count indictment that Tameka Lewis, who had been employed since 2017 by the New York City Department of Corrections (DOC) as a counselor in the Otis Bantum Correctional Center (OBCC) on Rikers Island, accepted bribes from the associates of people detained at OBCC in return for facilitating the smuggling of drugs into the facility.[1] Unbeknownst to Lewis, the New York City Department of Investigation (DOI) and the Federal Bureau of Investigation (FBI) began investigating her in 2019. As relevant here, the investigators ultimately obtained payment and messaging records from the mobile payment platform CashApp that

---

[1] Specifically, Lewis is charged with one count of conspiracy, 18 U.S.C. § 371, related to the alleged scheme to smuggle contraband into OBCC in exchange for payments from detainees and their associates; one count of federal program bribery, 18 U.S.C. § 666; one count of honest services wire fraud, 18 U.S.C. §§ 1343, 1346; and one count of distribution of a controlled substance analogue, 21 U.S.C. § 841. See ECF 1.

evidenced communications and payments related to the alleged smuggling and bribery scheme. As a consequence, Lewis was stopped by DOI agents on her way into OBCC on September 18, 2020 and asked to accompany the agents to a small office. After a hand search of her transparent purse revealed a stash of paper with suspicious markings -- papers later determined to have been soaked in synthetic cannabinoids -- the DOI agents proceeded to question Lewis and to seize her mobile phone, which had been secured in a DOC staff locker in the parking lot outside of OBCC. After she terminated further questioning, Lewis was released without being arrested. She was subsequently suspended without pay and escorted from Rikers Island. The Government later searched the data on her phone, pursuant to a duly issued warrant obtained four business days after the phone was seized.

Lewis now moves for suppression of the contraband recovered from her purse, the evidence recovered from her phone, and the statements she made to the DOI agents. She argues that both the warrantless search of her purse and seizure of her phone infringed her Fourth Amendment rights. She further argues that her statements should be suppressed because the DOI agents' questioning amounted to a custodial interrogation conducted without Miranda warnings and because their methods rendered her statements involuntary.

The Court here presumes the parties' familiarity with the factual record before the Court for the purpose of this motion, and

so discusses the facts only insofar as they are relevant to the legal issues resolved below. In support of her Motion to Suppress (Motion), Lewis filed an affidavit setting forth her account of the search, seizure, and questioning on September 18, 2020. ECF 12-1 (Lewis Aff.). While the Government reserves its right to challenge Lewis' factual assertions, it assumes the truth of Lewis' factual assertions arguendo for the purpose of opposing the Motion. See Opp. 1 n. 1. The Government further provided in support of its opposition an affidavit of DOI Correction Officer Investigator Andrew Walker, attaching certain DOC policies relating to the control of contraband and search of employees entering DOC facilities and certain evidence collected by investigators before Lewis was stopped at OBCC on September 18, 2020. ECF 14. Since the Motion can be decided without resolving any factual disputes, the Court previously determined that an evidentiary hearing was unnecessary and so-informed the parties.

For the reasons set forth below, the Court denies in full Lewis' motion to suppress.

## Analysis

I.   **The Purse**

On the morning of September 18, 2020, Lewis arrived on Rikers Island to begin her shift as a counselor, parked in an employee lot, placed her mobile phone in a DOC locker, and entered OBCC. Lewis Aff. ¶ 2-3. Consistent with the DOC policies discussed further below, Lewis went through a metal detector and placed her transparent pink

purse into an X-ray machine to be scanned for contraband. Id. ¶ 3. After clearing the metal detector and X-ray machine, four DOI investigators stopped Lewis and escorted her to a small office. Id. ¶¶ 3-4. Inside the office, the DOI agents patted Lewis down and inspected her purse and its contents by hand. Id. ¶ 5. The agents removed two colored folders and a photo-sized envelope, each of which contained pieces of paper that the Government alleges were soaked in synthetic cannabinoids. Id. ¶ 6; ECF 1 ¶¶ 27-28.

The defense argues that the DOI agents' hand search of Lewis' transparent purse and their subsequent seizure of the synthetic-cannabinoid-soaked papers violated her Fourth Amendment rights. The defense acknowledges that, in this context, Lewis' Fourth Amendment rights are circumscribed by the "special needs doctrine," which permits government employers to conduct reasonable searches without warrants pursuant to justified workplace policies. See Mot. 5 (citing City of Ontario, Cal. V. Quon, 560 U.S. 746, 761 (2010)). The Second Circuit has held that an "investigatory search for evidence of suspected work-related employee misfeasance will be constitutionally reasonable if it is justified at its inception and of appropriate scope." Leventhal v. Knapek, 266 F.3d 64, 75 (2d Cir. 2001) (Sotomayor, J.).[2] A search is justified at its inception if "there

---

[2] Unless otherwise specified, all internal quotation marks, citations, emphasis, and alterations have been removed from all sources cited herein.

are reasonable grounds to believe that the search[] would uncover evidence of misconduct." Id. at 75. Probable cause is not required. Id. Furthermore, the Government correctly argues that "the 'special needs' principle applies with particular force in the context of correctional facilities, where 'central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves.'" Opp. 6 (quoting Pell v. Procunier, 417 U.S 817, 823 (1974)).

The Court holds that even assuming arguendo that the examination constituted a Fourth Amendment search (which it did not, for reasons described below), the DOI agents' inspection of Lewis' purse was reasonable under the special needs doctrine. Lewis argues that the scope of the DOI agents' search of her purse was unreasonable, because there was "nothing inherently suspicious about colored folders and blank pieces of paper," and "nothing about these items suggested that they were contraband, thus requiring a more intrusive search of Ms. Lewis' purse." Id. at 6. But the Government identifies the specific workplace policy barring DOC employees from "enter[ing] into any transaction with an inmate" and from "carry[ing], convey[ing], or mak[ing] accessible to an inmate within a facility/command any intoxicant, opiate, narcotic, or other contraband article." See ECF 14-2 at 7. The Government further presents records it obtained before the search reflecting Lewis' account activity on the electronic payment platform CashApp, along

with Rikers Island visitor logs.[3] See ECF 14-6, 14-7, 14-8, 14-9. These records provide ample reason to believe that Lewis was smuggling contraband to inmates in exchange for bribes in violation of these workplace policies. The scope was also of "appropriate scope," Leventhal, 266 F.3d at 75, given the multifarious means by which contraband is smuggled into jails (not to mention the DOI agents' asserted awareness of how Lewis was smuggling drugs into the facility). See, e.g., United States v. Romain, 2015 WL 5920020, at *2 (S.D.N.Y. Oct. 9, 2015) (describing how the defendant, a corrections officer, would "obtain ... marijuana, package it in the fingers of latex gloves, and smuggle it into Rikers").

Further still, there is an independent ground for denial of this prong of Lewis' Motion: As the Government forcefully argues, the DOI agents' examination of Lewis' purse did not even amount to a search under the Fourth Amendment. "A Fourth Amendment 'search' ... does not occur unless the search invades an object or area where one has a subjective expectation of privacy that society is prepared to accept as objectively reasonable." United States v. Hayes, 551 F.3d 138, 143 (2d Cir. 2008). It is well established that employees

---

[3] The defense disputes that these records sufficed to create reasonable suspicion because the transaction records did not reflect payments from inmates themselves. Reply 3-4. But the Government demonstrates an adequate link between Lewis' CashApp counterparties and specific inmates at OBCC through the content of the CashApp messages and the Rikers Island visitor logs.

- 6 -

at correctional institutions have a "significantly" diminished expectation of privacy, both as a function of the unique context of the "nature of their place of employment" (here, a jail) and because of "the notice provided by the Department in [its] rule book at the time of hire." Sec. & L. Enf't Emps., Dist. Council 82, Am. Fed'n of State, Cty. & Mun. Emps., AFL-CIO by Clay v. Carey, 737 F.2d 187, 202 (2d Cir. 1984). The Government has supplied the Court with the applicable DOC policy on the "Control of and Search for Contraband" as an exhibit to the Walker Affidavit. ECF 14-1. It provides, inter alia, that "[a]ll civilian and uniformed personnel, regardless of title or rank, shall be subject to search and inspection, including all carried possessions (e.g., packages, bags, etc.)" upon entry to the jail. Id. at 5. The policy also provides that "[r]egardless of their contents or point of origin, all ... bags ... are subject to a complete and thorough search when entering or departing a departmental facility." Id. at 6.[4] These DOC policies clearly

---

[4] Lewis argues that DOC's policies were not followed in this case because the suspected contraband was not subject to a visual inspection before its removal from her purse. Reply 2-3. This is a doubtful interpretation of the policies, but even assuming arguendo the defense's questionable reading, the policy states that "[a]ny questions or doubts [as to the admissibility of an item] shall be resolved prior to the individual or item entering the facility." Id. at 3 (quoting ECF 14-1 at 6). This provision is an expansive charge to inspect items brought into a DOC facility to determine whether they contain contraband. It cannot be reconciled with the defense's assertion that Lewis was entitled to some visual inspection that would have terminated the search unless an object looked like contraband. And as the Government explained at argument, the

notified Lewis that she had no reasonable expectation of privacy in any object she took into OBCC. Therefore, the DOI agents' inspection of her purse was not a Fourth Amendment search.

Accordingly, the DOI agents' inspection of Lewis' purse did not infringe her Fourth Amendment rights, and her motion to suppress the contraband found within her purse is denied.

**II. The Phone**

After Lewis parked her car in the employee lot on Rikers Island, but before she entered the OBCC, she placed her mobile phone in a locker, since DOC policy prohibits personal phones inside OBCC, as she well knew. Lewis Aff. ¶ 2. After the DOI agents had inspected her purse and found the papers discussed above, they escorted Lewis to the parking lot, where they told Lewis to retrieve her mobile phone from the locker and hand it over. Id. ¶ 7. Lewis declares that she "did not think [she] was able to tell them 'No,'" so she "turned over [her] phone to one of the investigators." Id. Lewis states that she repeatedly refused the agents' requests for consent to search her phone and requests for information that would enable them to unlock it. Id. ¶¶ 17-19, 22. The agents seized and retained the phone after Lewis terminated questioning. Id. ¶ 22. The Government

---

provision that Lewis cites governs routine searches at entrances to DOC facilities, not inspections by DOI agents conducting targeted investigations of DOC employees' misconduct, which was the context in which Lewis' purse was examined by hand.

later conducted a search of the phone's data pursuant to a duly issued warrant obtained four business days later. See Opp. 14 n. 12.

The defense argues that the seizure of Lewis' phone was illegal because it was without permission and not pursuant to an arrest. Mot. 6-8. (Lewis was arrested eight months later.) Lewis further argues that her mobile phone was subject to heightened protection under the Supreme Court's decision in Riley v. California, 573 U.S. 373, 395-397 (2014). But, as the Government points out, the defense asserts an incorrect standard. Opp. 12-13. Assuming without deciding that the seizure of Lewis's phone was tantamount to a Fourth Amendment search, the phone was confiscated from a locker on DOC property after her arrival for work at the jail, a "highly regulated environment where permissible articles are tightly controlled." Id. 14. The Government therefore argues that this search was analogous to "a government employer's search of an employee's desk, office, or filing cabinet, none of which requires a warrant or probable cause" under the Fourth Amendment. Id. 12-13; see also Shaul v. Cherry Valley-Springfield Cent. School Dist., 363 F.3d 177, 184-185 (2d Cir. 2004) (holding that warrantless searches of a teacher's desk and cabinets were reasonable given there was reasonable suspicion of professional misconduct). The Court agrees that this was a workplace search under the framework described above, so the special needs doctrine applies. The test for a permissible workplace search is, again, whether the search was "justified at its inception

and of appropriate scope." Leventhal, 266 F.3d at 75.

The Government has amply documented that the search of the locker and seizure of Lewis' phone was justified at the outset and appropriate in scope, so it was permissible under the special needs doctrine. A workplace search is "justified at its inception when there are reasonable grounds for suspecting that the search will turn up evidence that the employee is guilty of work-related misconduct." O'Connor v. Ortega, 480 U.S. 709, 726 (1987). The CashApp transaction records -- transactions undertaken through a mobile app -- together with the Rikers Island visitor logs establish reasonable suspicion that the phone would contain evidence relevant to the investigation of contraband smuggling and bribery. See ECF 14-6, 14-7, 14-8, & 14-8. Accordingly, the seizure of Lewis' phone did not infringe her Fourth Amendment rights.

Riley, which held that the police may seize a phone pursuant to a lawful arrest but must obtain a warrant before searching the data it contains, 573 U.S. at 386, is not to the contrary. Here, the Government seized Lewis' phone subject to lawful authority and then held it without further examination until a search warrant was obtained from a magistrate judge of this Court. That is precisely what Riley requires. Therefore, the workplace seizure of Lewis's phone did not infringe her reasonable expectation of privacy in the data held on the device, since these data were only accessed after the Government complied with the Fourth Amendment's full scope of

procedural protections.

Therefore, the Court denies Lewis' motion to suppress evidence recovered from her phone.

### III. The Statement

The defense seeks suppression of Lewis' statements made to the DOI agents on September 18, 2020 on two grounds: (1) that she was custodially interrogated without Miranda warnings and (2) that her statements were not voluntary. For the reasons explained below, the Court finds that neither argument requires suppression of Lewis' statements.[5]

#### A. Miranda Protections

Lewis seeks suppression of her statement on the ground that she was "in custody" but never received Miranda warnings. Suppression of a defendant's "statements, whether exculpatory or inculpatory, stemming from custodial interrogation" is appropriate unless the Government "demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda v. Arizona, 384 U.S. 436, 444 (1966). Any waiver of the privilege must be "made voluntarily, knowingly and intelligently." Id. The Government does not contend that the DOI agents provided Lewis with a Miranda warning; the only issue is whether Lewis' interrogation

---

[5] The Government submitted audio recordings of Lewis' interview, and neither party has identified statements at issue other than those contained on the recordings.

by the DOI agents was custodial. After reviewing the parties' submissions and applicable law, the Court determines that Lewis was never "in custody" on September 18, 2020.

There is an objective test for whether a defendant is "in custody" during questioning:

> "whether a reasonable person in defendant's position would have understood himself to be subjected to the restraints comparable to those associated with a formal arrest. An accused is in 'custody' when, in the absence of an actual arrest, law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave."

United States v. Ali, 68 F.3d 1468, 1472 (2d Cir. 1995). An interrogation may still be custodial under certain circumstances even when a defendant "was specifically advised that he was not being placed under arrest." United States v. Newton, 369 F.3d 659, 676 (2d Cir. 2004) (reversing district court and holding that handcuffed defendant was "in custody" despite being told he was not under arrest during "safety search" by police and parole officers). Nevertheless, a "statement to [a] suspect that [s]he was not under arrest, was free to leave at any time, and would not be arrested at the end of the interview ... is a fact that may be considered in assessing the extent to which a reasonable person would understand any restraints on his freedom to be comparable to those associated with a formal arrest." Id.

The Motion argues there were several "factors that would lead any reasonable person to believe that they were in custody and not

free to leave" the interview conducted by the DOI agents: (i) Lewis was surrounded by DOI investigators at the security checkpoint and "forced to follow these investigators into a small windowless office, where she was searched, and where her purse was seized and searched;" (ii) when Lewis was allowed to take a cigarette break, she was escorted by an investigator, who continued to question her; and (iii) the bathroom was searched before and after Lewis used it. Mot. 10-11. In her affidavit, Lewis also states that she "believed that if [she] did not speak to [the investigators], [she] would be arrested." ECF 12-1 ¶ 10. The defense nonetheless acknowledges that that "Lewis was told she was free to not speak to investigators and could return to work," Mot. at 3.

After considering the "totality of the circumstances" described by Lewis, the Court concludes that her interrogation was not custodial under binding Second Circuit precedent. See United States v. FNU LNU, 653 F.3d 144, 146 (2d Cir. 2011). The Government stresses that Lewis was not restrained or handcuffed, never threatened, and spoken to in a conversational tone. Opp. 17. Crucially, Lewis signed a form confirming that her statement was "voluntary" and that she could stop the interview at any time without suffering an adverse employment action solely for her refusal. Id. (quoting ECF 14-3). The Government points out that Lewis never "ever asked or tried to leave the interview," United States v. Familetti, 878 F.3d 53, 60 (2d Cir. 2017); the defense does not identify any evidence to the

contrary, and the Government's representation is confirmed by the Court's review of the interview audio, see ECF 14-4, 14-5. The Government also correctly argues that Lewis' subjective belief, even if credited, is not controlling, since the test whether a defendant was in custody is an objective one. See Stansbury v. California, 511 U.S. 318, 323 (1994). As for Lewis' arguments about being accompanied to the bathroom and on cigarette breaks, the Second Circuit has rejected the argument that an investigator's decision to accompany a suspect as she moves around renders her interview custodial. United States v. Ross, 719 F.2d 615, 622 (2d Cir. 1983). Finally, the DOI agents gave no affirmative indications that Lewis was not, in fact, free to leave the interview. The audio recordings reflect that investigators repeatedly explained that Lewis was free to go, not under arrest, and permitted not to speak with them should she decline to do so. See ECF 14-4, 14-5. The DOI agents also promptly terminated their questioning when Lewis indicated she wanted it to stop. Id.

Therefore, a reasonable person in Lewis' situation would have understood that she was not under arrest and was free to go if she did not want to give a statement to the DOI agents. The Court accordingly holds that Lewis was not in custody during her questioning by the DOI agents, so Miranda warnings were not required.

**B. Voluntariness**

The Motion also contends that Lewis' statement should be suppressed because it was coerced. Lewis acknowledges that she signed

a voluntary statement form and quotes statements from the interview transcript in which the investigators repeat that she is being asked for a voluntary statement. Mot. at 12-14. Still, the Motion argues that the DOI investigators fooled Lewis by representing that they wanted to hear her side of the story and were trying to help her. This made the questioning coercive, the defense argues, because it tricked Lewis into believing that nothing she said would harm her legal position. Mot. 14.

But Lewis' position is contrary to well established law. Both the Supreme Court and the Second Circuit have rejected the contention that pre-arrest statements are coerced because investigators suggested that cooperation would lead to leniency or that the suspect would not be arrested if she talked. See, e.g., Illinois v. Perkins, 496 U.S. 292, 296 (1990) ("Ploys to mislead a suspect or to lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within Miranda's concerns."); United States v. Alvarado, 882 F.2d 645, 650 (2d Cir. 1989); United States v. Pryor, 474 F. App'x 831, 834 (2d Cir. 2012).

Lewis also contends that she feared for her job if she refused to answer. But the voluntary statement form she signed stated that no adverse employment consequences would follow solely from her refusal to answer questions in the interview. See ECF 14-3. The Motion identifies no case law supporting its contention that Lewis' fear of adverse employment actions rendered her statement

involuntary. And the Government contends, correctly, that the Second Circuit has rejected the notion that any economic threat from noncooperation is enough to make an interview coercive: "A statement challenged on the ground that it was obtained as the result of economic sanctions must be rejected as involuntary only where the pressure reasonably appears to have been of sufficiently appreciable size and substance to deprive the accused of his 'free choice to admit, to deny, or to refuse to answer.' It must amount to a choice 'between the rock and the whirlpool.'" U. S. ex rel. Sanney v. Montanye, 500 F.2d 411, 415 (2d Cir. 1974) (quoting Garrity v. New Jersey, 385 U.S. 493, 496, 498 (1967)). True, the Second Circuit has recognized that "the loss of civil service jobs by public employees ... could reasonably be viewed as threatening an economic catastrophe for those faced with the 'choice' of waiving constitutional rights or losing status and benefits as public employees." Id. But this does not mean that any questioning of a public employee related to alleged workplace misconduct is necessarily coercive, and the defense does not explain how Lewis' situation amounted to economic coercion under the applicable standard.

Finally, the defense insists at several points that Lewis' interrogation lasted over five hours, even though the recording only lasts for just over one hour. See, e.g., Reply 14-15; see also ECF 14-4, 14-5. The Government proffers evidence that, it represents,

would establish a timeline inconsistent with five hours of questioning. Opp. 22-23. But this factual dispute need not be resolved to decide the instant Motion. It remains undisputed that no significant questioning preceded the recorded statements already submitted by the Government. The Government also represents that it is unaware of any substantive statement made by Lewis after the recording cuts off and does not intend to introduce any later statement. Opp. 22-23. Finally, the defense conceded at argument that it cannot identify any statement to be suppressed that Lewis allegedly made after the recording cuts off. Therefore, even if Lewis had been interrogated for four additional hours after the recording, that fact would be irrelevant since that extended questioning could not have coerced the earlier, recorded statements. Therefore, the Court need not resolve this factual issue and concludes that Lewis' statement was voluntarily given.

Accordingly, the Court denies Lewis' motion to suppress her statement given to the DOI agents on September 18, 2020.

## Conclusion

For the reasons set forth above, Lewis' Motion is DENIED in its entirety.

SO ORDERED

Dated:   New York, NY
         August 27, 2021
                                         _____
                                         JED S. RAKOFF, U.S.D.J.